# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

MOUNT HAMILTON PARTNERS, LLC,

    Plaintiff,

v.

GROUPON, INC.,

    Defendant.

No. C 12-1700 SI

**CLAIM CONSTRUCTION ORDER**

On June 20 and 26, 2013, the Court held a tutorial and *Markman* hearing regarding the construction of ten disputed claim terms in one patent owned by plaintiff Mount Hamilton Partners, LLC.[1] Having considered the arguments of counsel and the papers submitted, the Court construes the disputed claim terms as follows.

**BACKGROUND**

**I.    Procedural Background**

Plaintiff filed the present action against Groupon, Inc. on December 21, 2011 in the United States District Court for the District of Delaware. On that same day, plaintiff also filed an action against Google, Inc., Case No. 12-cv-1698. The two cases were transferred to this Court on April 3, 2012.

---

[1] At the claim construction hearing, the parties appeared to agree that certain terms were no longer in dispute, or that the scope of the dispute had narrowed. Accordingly, after the hearing the Court directed the parties to file a joint statement describing any changes to their positions. In addition, because the parties' presentations at the tutorial and hearing lacked sufficient detail to enable the Court to understand their claim construction disputes, the Court permitted, but did not require additional briefing. MHP objects to this additional briefing and mischaracterizes the Court's position as having "ordered" it to provide an "impact statement." This is incorrect. To the extent the Court welcomed additional briefing it was because plaintiff's claim construction presentation – the primary focus of which was the abstract existence of the Internet – did not leave the Court in a position adequate to the task of construing the disputed claims. The Court did not permit additional briefing in order to prejudice its claim construction analysis by improperly considering the actual accused products. Instead, the Court provided the parties an opportunity to expand on what had been said – or not said – at the hearing.

Subsequently, the Court consolidated the two cases for claim construction purposes and held a *Markman* hearing on June 20 and 26, 2013. On December 26, 2013, the Court granted MHP and Google's stipulation to dismiss the action between them. Therefore, only the action between MHP and Groupon currently remains pending before the Court.

In the present action, plaintiff accuses Groupon of infringing U.S. Patent No. 7,904,334 B2, filed on May 21, 2004 and issued on March 8, 2011 ("the '334 Patent"). The '334 Patent is a continuation of U.S. Patent No. 6,742,969, issued May 25, 2004, which is itself a continuation-in-part of a pending U.S. Patent Application, Serial No. 09/461,336, filed on December 15, 1999.

## II.     Factual Background

The essence of the '334 Patent's invention is a computerized system for providing incentives to would-be diners that will cause them to shift their restaurant patronage toward that restaurant's less popular dining periods. Docket No. 56-5, '334 Patent at 1:27-2:3. Restaurants have a fixed number of seats and their goal is to maximize the number of customers in those seats at all times, otherwise they are losing potential revenue. *Id.* at 1:29-1:36. During periods when a restaurant's seats are generally full and/or there is a wait to be seated, there is peak demand and therefore no need to incentivize would-be diners. *Id.* During non-peak periods, when there are more empty seats than customers, there is excess capacity and irrevocably lost income. *Id.* The lost income problem is exacerbated by the fact that restaurants typically lack detailed customer information. *Id.* at 1:37-1:41. As a result, they are often inefficient in using mass market media (TV, radio, newspaper) to target customers. *Id.*

The '334 Patent solves these twin problems of excess restaurant capacity and lack of customer information by teaching a computerized business method—a series of steps involving computerized modules—to increase the efficiency of the process of targeting would be customers in order to induce them to use the non-peak dining hours. While half-price movie matinees, taco Tuesdays, and early bird specials are nothing new, the '334 Patent purports to contain a unique combination of features to streamline this time-honored business strategy of dynamic pricing and discounting.

The asserted claims in the '334 Patent (claims 1, 2, 6-14,16 and 21) relate to a website that will implement this streamlined incentive process. *See* '334 Patent at 23:39-24:15, 24:28-26:30, 26:50-

26:51, 27:7-27:10. The website responds to user requests for incentives by supplying incentives that correspond to both user preferences and restaurant capacity demands/desires for increased patronage. *See, e.g.*, *id.* at 23:55-24:8. The '334 Patent's specifications describe several embodiments, including various auction-type websites. However, the embodiment at issue in this case is a non-auction website:

> According to another aspect of the invention, the system may offer incentives that may be obtained without participation in an auction. Users may be interested in using the incentive right away and may desire an instant incentive, instead of waiting for an auction to be completed. According to one embodiment, a user may submit one or more incentive requests for selected restaurants along with certain dining parameters. These requests may be processed by or for the restaurants to determine if a dining incentive should be issued to the user. For example, via the website, a user may select one or more restaurants from a list of participating restaurants and enter various dining parameters. Each selected restaurant may then determine whether or not to accept the incentive request, based on the user entered dining parameters and other information. If the restaurant decides to accept the request, a dining incentive may be offered to the user.
> …

'334 Patent at 6:36-59. Each of the asserted apparatus claims recites a system with the following components: a registration module, a storing module, a request module, and an incentive module. *See id.* at 23:47-24:11, 24:44-25:9. The registration module registers and obtains information from a user, and the storing module manages storage of this information. *See id.* at 23:47-49. The request module receives a request from the user containing the business characteristics that the user prefers (i.e., restaurant type, hours, location, etc.). *See id.* at 23:50-23:54. The incentive module responds to the user request by presenting incentives from restaurant(s) that fit the user request or are acceptable alternatives. *See id.* at 23:55-24:8. The parties' claim construction disputes center on terms that describe the operation of the request and incentive modules.

## LEGAL STANDARD

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; *see also Vitronics Corp. v.*

3

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, claim terms are construed in light of their ordinary and accustomed meaning, unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). The written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n.6.

In addition, the claims must be read in view of the specification. *Markman*, 52 F.3d at 978. Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently with that limitation. *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*, 52 F.3d at 980. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

4

However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

## DISCUSSION

The parties' claim construction dispute centers on ten terms that occur throughout the claims. The Court will address each in turn.

**1.    Periods of Peak Demand / Non-peak Demand**

Although listed as two separate disputed terms, the Court will construe the peak/non-peak demand terms together because they are closely related.

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| A computer-implemented system/method for reducing excess capacity for one or more restaurants/businesses in an industry that experience "**periods of peak demands**" and periods of non-peak demands. . .<br><br>'334 Patent, Claims 1, 8, 11, 14 | "periods where demand for a service is relatively high" | Indefinite, alternatively, "periods of time designated by a restaurant/business as busy" |

5

| A computer-implemented system/method for reducing excess capacity for one or more restaurants/businesses in an industry that experience periods of **"non-peak demands . . .** incentives with restrictions specifying valid dates and/or times that correspond to **"non-peak demand periods"** of the restaurants/businesses '334 Patent, Claims 1, 8, 11, 14 | "periods where demand is below peak demand" | Indefinite, alternatively, "periods of time designated by a restaurant/business as not busy" |
|---|---|---|

Groupon contends that the '344 Patent's attempt to distinguish peak from non-peak periods renders the asserted claims invalid for indefiniteness. Groupon argues that , when confronted with the terms "peak demand" and "non-peak" demand, a person of ordinary skill in the art would not know how to avoid infringement because these terms are highly subjective and restaurant/business/industry dependent. For example, a ski resort's non-peak period is likely to be a beach resort's peak period. Similarly, the downtown location of a chain restaurant may consider lunch hours during Monday through Friday peak, while the suburban location may consider the same hours non-peak. In response, MHP argues that the terms can be construed and that the issue of indefiniteness should be decided at the summary judgment stage.

Under 35 U.S.C. § 112, a patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [his or her] invention." 35 U.S.C. § 112 ¶ 2. "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Id.*

"A claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.'" *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013). "When a 'word of degree'

6

is used, the court must determine whether the patent provides 'some standard for measuring that degree.'" *Id.* "General principles of claim construction apply when determining indefiniteness." *Id.*

Here, the terms "periods of peak demands" and "periods of non-peak demands" are amenable to construction. It is clear from the terms themselves that "peak demand" and "non-peak" demand are related and contrasting concepts. MHP argues that "peak demand" means a period where "demand for a service is relatively high" and "non-peak demand" means a periods where "demand is below peak demand." MHP's construction is supported by language in the specification explaining that peak hours are times where there is greater demand for services and there is little or no excess capacity. *See* '334 Patent at 1:30-35, 8:45-46, 12:49-51. Similarly, the specification explains that off-peak hours are times when there is relatively less demand and relatively more excess capacity, resulting in lost revenue. *See id.* at 1:27-36, 8:15-27, 8:45-46, 12:45-51, 19:64-20:11. Accordingly, the Court agrees with MHP's proposed construction, but will add language that clarifies that the terms "peak demand" and "non-peak demand" are related to whether the restaurant/business has excess capacity. Indeed, in its briefing, MHP recognizes this relationship. *See* Docket No. 66-12, Bjurstrom Decl Ex. 15 at 4 ("during any of those non-peak demand periods (i.e., when it has excess capacity)"), at 5, ("During times when a restaurant has seats that are generally full or there is a wait, there is peak demand . . . ."), at 6 ("The patent clearly ties peak/non-peak demand to the fixed number of seats in the restaurant vs. the number of people to fill those seats").

Groupon's alternative proposed construction for this term adds the requirement that the peak/ non-peak periods of time must be designated by the restaurant/business. There is no language in the asserted independent claims requiring that the restaurant/business designate what time periods it considers to be peak and non-peak. The specification refers to restaurants offering incentives usable during a predetermined period of time. *See* '334 Patent at 1:51-56, 8:15-20. However, in doing so, the specification states that it is merely referring to one embodiment of the invention. *See id.* "'[I]t is improper to read limitations from a preferred embodiment described in the specification-even if it is the only embodiment-into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.'" *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012). Here, there was no intentional disclaimer or disavowal of claim scope. Accordingly, the Court

7

declines to add to its construction of these terms the requirement that the periods of time be designated by the restaurant/business.

**Periods of peak demand**, therefore, is construed as "periods of time where demand for a service is relatively high and excess capacity is relatively low." Accordingly, **periods of non-peak demand** is construed as "periods of time where demand is below peak demand levels and excess capacity exceeds peak demand levels."

The Court notes that although it is able to arrive at constructions for these two terms, this does not resolve Groupon's indefiniteness argument. *See* Docket No. 84 at 4 (arguing that even if the Court is able to construe the terms, the asserted claims are still invalid for indefiniteness). The Federal Circuit has explained that "a reduction of the meaning of a claim term into words is not dispositive of whether the term is definite . . . . And if reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008). "'Thus, a construed claim can be indefinite if the construction remains insolubly ambiguous . . . .'" *Biosig*, 715 F.3d at 898. Accordingly, it remains to be determined whether the two claims terms as construed by the court render the asserted claims insolubly ambiguous. However, the Court finds that it would be more appropriate to address this remaining issue at the summary judgment stage rather than the claim construction stage. *See, e.g.*, *Takeda Pharm. Co. v. Handa Pharms., LLC*, C-11-00840 JCS, 2012 U.S. Dist. LEXIS 51013, at *47-48 (N.D. Cal. Apr. 11, 2012) (explaining that the question of whether the claim as construed is indefinite is "more suitable for determination on summary judgment than at the claim construction phase of the case"); *Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007).

8

### 2. "Modules Configured to/Module is Configured to . . ."

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| a registration **"module configured to"** obtain information . . .<br><br>a request **"module configured to"** present an interface . . .<br><br>'334 Patent, Claims 1, 8, 11, 14<br><br>the incentive **"module is configured to"** provide/set the restrictions on the incentives . . .<br><br>'334 Patent, Claims 1, 2, 8 | "components which performs a defined task" | "discrete source code unit that, when executed, must" perform the specified function |

The parties' dispute over this claim term is two-part. First, the parties disagree as to whether the term "module" requires implementation through source code or merely permits it. With respect to the term "configured to," the parties agree that a module performs a function or task, but disagree as to whether a module, when executed, must perform that function or task.

In support of their contention that the term "module" requires implementation through source code, Groupon notes that each of the asserted claims states that the modules are "computer program module[s]." For example, claims 1 and 8 recite a "computer program module" that is "compris[ed]" of a "registration module," a "request module," and an "incentive module." '334 Patent at 23:44-61, 24:41-58. Groupon further argues that computer programs must be implemented through source code, and, therefore, the claimed "modules" must be discrete source code units. However, Groupon is incorrect, and the claims do not always refer to modules as "computer program modules." For example, claim 1 describes a "computer-implemented system" comprising of: (1) "a server configured to execute computer program modules"; and (2) "a storing module." '334 Patent at 23:39-24:11. Here, claim 1 uses the term "module" to describe a "storing module" without stating that it is a computer program. "[C]laim terms are normally used consistently throughout the patent." *Philips*, 415 F.3d at 1314.

9

1  Therefore, the term "module" as used in the claims is not limited computer program modules.
2  Accordingly, the Court declines to adopt a construction of the term "module" that would limit it to a
3  discrete unit of source code and instead adopts MHP's broader construction that refers to a "module"
4  as a "component."

5  With respect to whether a given module *must* perform the recited functions, the Court agrees
6  with MHP's position. For each module envisioned, the claims recite that it is "configured to" achieve
7  a given objective. For example, the "registration module" must be designed to "obtain information
8  about users via the website" and "register the users to user accounts on the website." '334 Patent at
9  23:47-49. If the request module is not designed in such a way as to achieve the stated objectives, then
10 it is not consistent with the claim terms. Indeed, following the *Markman* hearing, the parties agree that
11 "a module designed to perform a specified function must exist in the claimed system." Docket No. 80.
12 But, this does not mean that the module must *only* perform the stated functions and no others. Rather,
13 to be consistent with the claim terms it must be designed to perform those functions, i.e. the registration
14 module must be designed to at least obtain information and allow users to register. Therefore, the Court
15 rejects Groupon's proposed construction. Although the Court agrees with MHP's position, the Court
16 will slightly alter MHP's proposed construction to clarify that the components are designed to perform
17 the claimed functions. Accordingly, **"module configured to"** is construed as "components which are
18 designed to perform a defined task(s)."

### 3.  Website

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| computer program modules corresponding to a **"website"**<br><br>present an interface to a user via a **"website"**<br><br>'334 Patent, Claims 1, 8, 11, 14 | "collection of files and related resources accessible through the World Wide Web and organized under a particular domain or set of related domains" | "a group of documents identifiable by respective URLs and which require a Web browser and Internet connection to be displayed on a user device" |

1 Initially, the parties disputed whether the claim term "website" should be construed broadly to 2 include a "collection of files" or narrowly to include "a group of documents." The parties now agree, 3 and so too does the Court, that a person of ordinary skill in the art at the time of the invention would 4 understand that a website is not limited to textual documents. *See* Docket No. 80. Such a person would 5 have understood a website to include different types of files, including photos, videos, and audio.

6 The parties' remaining dispute centers on whether a website requires an Internet connection and 7 a web browser to be accessed. MHP contends that a website need only be capable of being accessed 8 through the Internet; MHP argues that the website need not actually be accessed through the Internet 9 or by a web browser. Groupon contends that websites can only be displayed with an Internet connection 10 and a web browser. The Court agrees with MHP's proposed construction. The specification of the '334 11 Patent supports a broader construction of the term "website" than the restrictive one provided by 12 Groupon. The specification provides: "Users 1170 may access processing system 1120 through portals 13 1130, such as web-based search engines and other Internet services; directories 1140; wireless devices 14 1150, such as cellular phones and personal digital assistants (PDAs); and dining sites 1160, such as 15 reservation services, restaurant guides. Other modes of accessing processing system 1120 may also be 16 implemented." '334 Patent at 20:22-28, fig. 11. Accordingly, the specification states that the system 17 may be accessed through a wide variety of methods. In support of its narrow construction, Groupon 18 relies solely on the definition of the term "website" contained in a computer science dictionary from 19 2001. Docket No. 63-13, Hultquist Decl. Ex. 12. However, extrinsic evidence cannot be used to alter 20 a claim construction dictated by a proper analysis of the intrinsic evidence. *On-Line Techs., Inc. v.* 21 *Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004). Therefore, **"website"** is 22 construed as a "collection of files and related resources accessible through the World Wide Web and 23 organized under a particular domain or set of related domains."

#### 4. Concomitantly Presents to a User via the/a Website

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| an incentive module configured to **"concomitantly present to a user via the website"** . . . a plurality of incentives<br><br>'334 Patent, Claims 1, 8, 11, 14 | "concurrently present via the website" | Indefinite, alternatively, "presenting associated incentives via the website" |

Groupon argues that this claim term is indefinite because the specification does not contain the term "concomitantly" and does not indicate how a plurality of incentive offers are displayed "concomitantly." As discussed, "[a] claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.'" *Biosig*, 715 F.3d at 898. Here, the Court is able to arrive at a discernable construction for this term after reviewing the relevant evidence.

MHP contends that "concomitantly" means "concurrently" and that this view is supported by the specification, the prosecution history, and extrinsic evidence. The Court agrees. The specification states: "the one or more offers and applicable incentives may be displayed to the user. The user may then select the desired restaurant and incentive . . . ." '334 Patent at 18:65-67, fig. 9. For the user to be able to select a desired incentive out of the multiple incentives offered, the incentives must be display in some concurrent fashion to the user. The prosecution history also supports MHP's construction. The limitation "concomitantly presents" was added to the claims to distinguish the invention from the DeLorme prior art reference, which only displayed incentives related to one restaurant at a time to the user, whereas the '334 Patent is capable of concurrently displaying incentives from multiple restaurants at the same time. *See* Docket No. 66-10, Bjurstrom Decl. Ex. 13 at 51-52 ("[In DeLorme,] any special offers that are input or accepted through the 'discount' field correspond only to the single restaurant that was previously selected. . . . As such, the dialog box 595 [of DeLorme] does not 'concomitantly present . . . a plurality of incentives for dining at any of a set of two or more restaurants . . . .'"). In addition, MHP has provided the Court with extrinsic evidence defining the word "concomitant" as "occurring or existing concurrently." Docket No. 57-6, Bjurstrom Decl. Ex 7. Citing to extrinsic evidence, Groupon

argues that "concomitantly" means more than "concurrently" or "occurring at the same time." But one of the sources cited by Groupon defines the word "concomitant" as "accompanying; concurrent." Docket No. 63-10, Hultquist Decl. Ex. 9. Accordingly, Groupon's own evidence supports MHP's proposed construction.

Therefore, **"concomitantly present to a user via the website"** is construed as "concurrently present to a user via the website." As with the terms "periods of peak demands" and "periods of non-peak demands," Groupon argues that even if the Court is able to arrive at a construction for the term "concomitantly present to a user via the website," the asserted claims remain invalid for indefiniteness. Docket No. 84 at 6. The Court again finds that this remaining issue is more appropriately addressed at the summary judgment stage rather than at claim construction. *See, e.g.*, *Takeda*, 2012 U.S. Dist. LEXIS 51013, at *47-48 ; *Intergraph Hardware*, 508 F. Supp. 2d at 773 n.3.

**5.    In Response to Receipt of a/the Received User Requests for Incentives**

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| one or more computer program modules configured to concomitantly present to the user via the website, **"in response to the received user request for incentives"**<br><br>'334 Patent, Claims 1, 11, 14 | "to take action based on a user request for incentives" | "processing using the received request submitted by a user for incentives" |

The parties dispute whether the invention requires a user request to be "processed" prior to issuing a response to the request. The claim language does not require processing each user request prior to issuing a response. In support of its argument that the request must be processed, Groupon relies on language in the specification describing preferred embodiments. However, "it is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.'" *DealerTrack*, 674 F.3d at 1327. Here, the language in the specification cited by Groupon does not clearly require that a user request must be processed. To the contrary, the

13

specification uses permissive language and merely states that "[e]ach request *may* be processed and understood by the claimed system." '334 Patent at 12:39-40 (emphasis added). Therefore, the Court rejects Groupon's proposed construction. Accordingly, the Court construes **"in response to the received user request for incentives"** as "to take action based on a user request for incentives."

### 6. Correspond/Corresponding To

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| a server configured to execute computer program modules **"corresponding to"** a website '334 Patent, Claims 1, 7, 8, 11, 14 | "relating to" | "match[ing]" |

The parties initially disputed whether "corresponding to" requires merely a relationship or a close correspondence. At the claim construction hearing, the parties stipulated that the term has a plain meaning and need not be construed. *See* Docket No. 80. Accordingly, the Court declines to construe the term "corresponding to." *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims. Rather, '[c]laim construction is a matter of resolution of *disputed* meanings . . . .'" (emphasis in original and added and citations omitted)).

**7.     Responsive to a First Restaurant/Business of the Set of Restaurant/Businesses Having a Different Non-Peak Demand Period than a Second Restaurant/Business of the Set of Restaurant/Businesses.**

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| the incentive module is configured such that **"responsive to a first restaurant/business of the set of restaurant/businesses having a different non-peak demand period than a second restaurant/business of the set of restaurants/businesses"** the incentive module concomitantly presents to the user via the website<br><br>'334 Patent, Claims 1, 8, 11, 14 | "taking into account that different restaurants/businesses can have different non-peak demands" | "as a result of detecting that a first [restaurant/business] has a different non-peak period than a second [restaurant/business]" |

Although the parties dispute the entire phrase, the core of the dispute is over the phrase "responsive to." Groupon argues that the term "responsive to" requires perception, evaluation, and a calculated reaction, and, therefore, proposes that the Court use the word "detecting" in its construction. MHP argues that the term "responsive to" merely requires taking something into account, and that nothing in the claims or the specification requires that the incentive module has to actively "detect" non-peak periods. The Court agrees with MHP. The invention merely requires that the incentive module is able to take into account that different business may have different non-peak hours when providing the user incentives. This could be done through some method of active detection, but it can also be done by simply taking into account predetermined rules that each business/restaurant provides to the system. Indeed, the specification expressly contemplates such predetermined rules. *See, e.g.*, '334 Patent at 9:20-24 ("[R]estaurants may create customized rules that reside at a restaurant server or on the processing system of the web-site, where these customized rules are applied to each request to determine whether to award an incentive and how much the incentive should be."); *see also id.* at 17:52-55. For example, restaurant A could set its customized rules to only allow incentives for dining between 6 to 8 pm, and restaurant B could set its customized rules to only allow incentives for dining between 5 to 7 pm. When a user requests an incentive through the interface, the system could simply follow the

1 customized rules provided to it and offer the user an incentive from 6 to 8 pm for restaurant A and an
2 incentive from 5 to 7 pm for restaurant B. Here, the system offers incentives with different restrictions
3 without engaging in any active detection of the differences between the two restaurants.

4 Therefore, **"responsive to a first restaurant/business of the set of restaurant/businesses**
5 **having a different non-peak demand period than a second restaurant/business of the set of**
6 **restaurants/businesses"** is construed as "taking into account that different restaurants/businesses can
7 have different non-peak demands."

**8. User Requests are Received for Incentives for Dining/to Purchase Service**

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| a request module configured to present an interface to a user via the website through which **"user requests are received for incentives for dining"** at restaurants<br><br>computer program modules configured to present an interface to a user via the website through which a **"user request is received for incentives to purchase a service from businesses"**<br><br>'334 Patent, Claims 1, 8, 11, 14 | "information about incentives that a user is interested in receiving" | "submission[s] sent by a user for incentives, which can be accepted or rejected by a restaurant/business" |

The parties dispute whether a "user request" is subject to acceptance or rejection by the restaurant or business. The claim language merely states that the user requests are received by the system. *See* '334 Patent at 23:50-54. There is no claim language requiring that the restaurant or business then accept or reject the request. Groupon argues that the specification repeatedly refers to user requests being accepted or rejected by the business. This may be true, but the specification does so when describing preferred embodiments of the invention. *See, e.g.*, *id.* at 6:40-41 ("According to one embodiment . . . ."). It is improper for the Court to read limitations from preferred embodiments described in the specification into the claims absent a clear indication in the intrinsic record that the

16

patentee intended the claims to be so limited. *DealerTrack*, 674 F.3d at 1327. Here, there is no such clear indication in the intrinsic record. In the language cited by Groupon, the specification merely states that restaurant "may" determine whether to accept or reject the request. *See, e.g.*, '334 Patent at 6:47-49. Therefore,**"user requests are received for incentives for dining"** is construed as "information about incentives that a user is interested in receiving."

### 9. Restrictions

| Claim Term | MHP's Proposed Construction | Groupon's Proposed Construction |
|---|---|---|
| incentives are subject to **"restrictions"**<br><br>'334 Patent, Claims 1, 2, 8, 11, 14 | "rules or conditions (e.g., days and/or times that an incentive can be redeemed during the life of the incentive)" | "rules or conditions (including days and/or times that an incentive can be redeemed during the life of the incentive)" |

The parties' initially disputed whether "restrictions" must include days or times, or simply may include them. MHP insisted that days and times are only examples of restrictions restaurants may set, whereas Groupon contended that they are mandatory. In subsequent briefing Groupon agreed to adopt MHP's construction, Docket No. 63 at 20, with which the Court agrees for the reasons stated by MHP.

Accordingly, **"restrictions"** is construed as "rules or conditions (e.g., days and/or times that an incentive can be redeemed during the life of the incentive)."

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated: March 14, 2014

SUSAN ILLSTON
United States District Judge

17